**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**Case No.: _____**

GOVERNMENT EMPLOYEES INSURANCE
CO., GEICO INDEMNITY CO., GEICO
GENERAL INSURANCE COMPANY and
GEICO CASUALTY CO.,

     Plaintiffs,

vs.

CALIXTO ALFONSO, JR., D.C., P.A. and
CALIXTO ALFONSO, JR., D.C.,

     Defendants.

_____/

**Jury Trial Demand**

## COMPLAINT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), sue Defendants and allege as follows.

1.     This action seeks to recover more than $2,900,000.00 that Defendants wrongfully obtained from GEICO by submitting thousands of fraudulent and unlawful no-fault ("no-fault", "personal injury protection", or "PIP") insurance charges through Defendant Calixto Alfonso, Jr., D.C., P.A. ("Alfonso, P.A.") relating to medically unnecessary, illusory, unlawful, and otherwise non-reimbursable health care services and goods, including purported examinations, physical therapy services, diagnostic imaging services, and "extracorporeal shockwave therapy" ("ESWT") (collectively the "Fraudulent Services"), that purportedly were provided to Florida automobile accident victims who were eligible for coverage under GEICO no-fault insurance policies ("Insureds").

2.     In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $75,000.00 in pending fraudulent and unlawful PIP claims that Defendants have submitted through Alfonso, P.A. because:

(i)     at all relevant times, Defendants operated in violation of Florida law, including: (a) the licensing and operating requirements set forth in Florida's Health Care Clinic Act, Fla. Stat. §§ 400.990 et seq. (the "Clinic Act"); (b) Florida's False and Fraudulent Insurance Claims Statute, Fla. Stat. § 817.234(7) (the "False and Fraudulent Insurance Claims Statute"); and (c) Florida's Physical Therapy Practice Act, Fla. Stat. §§ 486.011-486.172 (the "Physical Therapy Act"), thereby rendering Defendants ineligible to collect PIP insurance benefits in the first instance, and rendering the Defendants' PIP insurance charges noncompensable and unenforceable;

(ii)    the underlying Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich Defendants, rather than to provide genuine patient care to the Insureds who purportedly received and were subjected to the Fraudulent Services;

(iii)   in many cases, the Fraudulent Services were never legitimately provided in the first instance;

(iv)    Defendants' billing for the Fraudulent Services misrepresented and exaggerated the nature, extent, and results of the Fraudulent Services, in order to fraudulently and unlawfully inflate the charges submitted to GEICO;

(v)     Defendants unlawfully billed GEICO for "physical therapy" services that were provided by massage therapists and unlicensed/unsupervised individuals; and

(vi)    Defendants' billing for the Fraudulent Services misrepresented the identities of the individuals who performed or directly supervised the Fraudulent Services, and the billing was submitted in violation of the requirements set forth in Florida's Motor Vehicle No-Fault Law, Fla. Stat. §§ 627.730-627.7405 (the "No-Fault Law").

3.     As such, Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO.

4.     The chart attached hereto as Exhibit "1" sets forth a large and representative sample of the fraudulent and unlawful claims that have been identified to date that Defendants have submitted through Alfonso, P.A. to GEICO by mail.

2

5.      The Defendants' fraudulent and unlawful scheme began no later than 2019, and has continued uninterrupted since that time. As a result of Defendant's fraudulent and unlawful scheme, GEICO has incurred damages of more than $2,900,000.00.

## THE PARTIES

### I.      Plaintiffs

6.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively, "GEICO") are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in Florida.

### II.      Defendants

7.      Defendant Calixto Alfonso Jr., D.C. ("Alfonso") resides in and is a citizen of Florida. Alfonso was licensed to practice chiropractic in Florida on or about June 4, 2001. Alfonso owned and controlled Alfonso, P.A., falsely purported to supervise the business activities at Alfonso, P.A., and used Alfonso, P.A. as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

8.      Defendant Alfonso, P.A. is a Florida professional corporation with its principal place of business in Miami, Florida. Alfonso, P.A. was incorporated in Florida in March 2008, had Alfonso as its owner and president, operated in violation of the Clinic Act, False and Fraudulent Insurance Claims Statute, and Physical Therapy Act, and was used as a vehicle to submit fraudulent and unlawful PIP insurance billing to GEICO and other insurers.

### III.      Vicente Lopez, M.D.

9.      Although he is not currently named as a Defendant in this action, Vincent Lopez, M.D. ("Lopez") is relevant to understanding the claims asserted by Plaintiffs in this action. Lopez

was licensed to practice medicine in Florida on or about June 4, 2001, and – in exchange for compensation from the Defendants – provided false "emergency medical condition" diagnoses to Defendants' patients, including GEICO Insureds, that increased the amount of PIP insurance payments that Defendants were able to obtain from GEICO and other insurers.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interests and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

11.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

12.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

13.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Southern District of Florida is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS

### I.      Overview of Pertinent Law Governing No-Fault Insurance Reimbursement

14.     Florida has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system is set forth in the No-Fault Law, which requires automobile insurers to provide personal injury protection benefits ("PIP Benefits") to Insureds.

15.     Under the No-Fault Law, an Insured can assign their right to PIP Benefits to health care services providers in exchange for their services. Pursuant to a duly executed assignment, a health care services provider may submit claims directly to an insurance company using the required claim forms – including the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form") –  in order to receive payment for medically necessary services.

16.     Pursuant to the No-Fault Law, insurers such as GEICO are only required to pay PIP Benefits for "medically necessary" services. At the same time, health care services providers are only eligible to receive PIP Benefits for medically necessary services.

17.     Pursuant to the No-Fault Law, "medically necessary" means:

[A] medical service or supply that a prudent physician would provide for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is:

(a)     In accordance with generally accepted standards of medical practice;

(b)     Clinically appropriate in terms of type, frequency, extent, site, and duration; and

(c)     Not primarily for the convenience of the patient, physician, or other health care provider.

18.     PIP reimbursement for health care services is normally limited to $2,500.00 per Insured. However, if a physician, physician assistant, or advanced practice registered nurse determines that an injured person suffered from an "emergency medical condition", health care providers can be reimbursed up to $10,000.00 per Insured for medically necessary and lawfully rendered health care services. See Fla. Stat. § 627.736.

19.     Pursuant to the No-Fault Law, an "emergency medical condition" means: "a medical condition manifesting itself by acute symptoms of sufficient severity, which may include

5

severe pain, such that the absence of immediate medical attention could reasonably be expected to result in any of the following: (a) [s]erious jeopardy to patient health[;] (b) [s]erious impairment to bodily functions[; and/or] (c) [s]erious dysfunction of any bodily organ or part."

20.     In order for a health care service to be eligible for PIP reimbursement, it not only must be medically necessary, but also must be "lawfully" provided.

21.     Pursuant to the No-Fault Law, "lawful" or "lawfully" means: "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment."

22.     Thus, health care services providers may not recover PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

23.     By extension, insurers such as GEICO are not required to make any payments of PIP Benefits for health care services that were not provided in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of Florida and federal law related to the provision of the underlying services or treatment.

24.     Pursuant to the Clinic Act, a license issued by the Florida Agency for Health Care Administration (the "AHCA") is required in order to operate a clinic in Florida. The Clinic Act defines "clinic" to mean: "an entity where health care services are provided to individuals and which tenders charges for reimbursement for such services, including a mobile clinic and a portable equipment provider."

25.     However, the Clinic Act provides an exemption from the clinic licensing requirements for:

A sole proprietorship, group practice, partnership, or corporation that provides health care services by licensed health care practitioners . . . that is wholly owned by one or more licensed health care practitioners, or the licensed health care practitioners set forth in this paragraph and the spouse, parent, child, or sibling of a licensed health care practitioner if one of the owners who is a licensed health care practitioner is supervising the business activities and is legally responsible for the entity's compliance with all federal and state laws. However, a health care practitioner may not supervise services beyond the scope of the practitioner's license. . . .

26.     Therefore, in order for an entity/health care practice to qualify for this "wholly owned" exemption from the Clinic Act's clinic licensing requirements, the licensed health care practitioner who "wholly owns" the practice has a continuing obligation to supervise the business activities of the practice and remain legally responsible to ensure that the practice operates in compliance with all federal and state laws, and the practice cannot provide health care services that are beyond the scope of the practitioner-owner's license.

27.     A health care practice that does not qualify for the "wholly owned" exemption, and that does not otherwise have a clinic license, operates unlawfully under Florida law.

28.     Unless a health care practice is operating pursuant to an exemption from the clinic licensing requirements, practices operating in Florida not only must obtain a clinic license, but must also "appoint a medical director or clinic director who shall agree in writing to accept legal responsibility for [certain enumerated] activities on behalf of the clinic."

29.     Among other things, a clinic medical director must be a licensed physician, and must "[c]onduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful. Upon discovery of an unlawful charge, the medical director or clinic director shall take immediate corrective action."

30.     In this context, a clinic medical director also must "[r]eview any patient referral contracts or agreements executed by the clinic."

7

31. In addition, a clinic medical director must "[e]nsure that all practitioners providing health care services or supplies to patients maintain a current active and unencumbered Florida license," and "[e]nsure that all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided."

32. Pursuant to the Clinic Act, "[a] charge or reimbursement claim made by or on behalf of a clinic that is required to be licensed under this part but that is not so licensed, or that is otherwise operating in violation of this part, regardless of whether a service is rendered or whether the charge or reimbursement claim is paid, is an unlawful charge and is noncompensable and unenforceable. A person who knowingly makes or causes to be made an unlawful charge commits theft within the meaning of, and punishable as provided in, [Fla. Stat. §] 812.014."

33. Thus, pursuant to both the No-Fault Law and the Clinic Act, clinics that operate in violation of the Clinic Act's licensing, medical director, or other operating requirements are not entitled to collect PIP Benefits, whether or not the underlying health care services were medically necessary or actually provided.

34. By extension, insurers such as GEICO are not required to make any payments of PIP Benefits to clinics that operate in violation of the Clinic Act's licensing, medical director, or other operating requirements, whether or not the underlying health care services were medically necessary or actually provided.

35. Under the False and Fraudulent Insurance Claims Statute, it is unlawful for a health care provider to engage in the general business practice of waiving – or failing to make a good-faith effort to collect – co-payments or deductibles from patients with PIP insurance.

36. Failure to make a good-faith effort to collect co-payments or deductibles renders the charges submitted by a health care provider unlawful and noncompensable.

8

37. Prior to January 1, 2013, the No-Fault Law permitted health care services providers, including clinics operating pursuant to the Clinic Act, to collect PIP Benefits for massage therapy or for services performed by massage therapists, so long as – among other things – the massage therapy or massage therapists' services were "provided, supervised, ordered, or prescribed by a licensed physician, chiropractor, or dentist, or was provided in a properly licensed or accredited institutional setting."

38. However, the No-Fault Law was amended, effective January 1, 2013, to prohibit reimbursement for massage or for any other services rendered by massage therapists, regardless of whether the massage therapists work under the supervision of other licensed health care practitioners.

39. The No-Fault Law was amended to prohibit reimbursement for massage or for services performed by massage therapists in response to widespread PIP fraud involving massage services and massage therapists.

40. Pursuant to the Physical Therapy Act, massage therapists may not practice physical therapy, or hold themselves out as being able to practice physical therapy, unless they have an actual license to practice physical therapy, as opposed to massage therapy.

41. The Physical Therapy Act also prohibits unlicensed individuals from practicing physical therapy. While the Physical Therapy Act does provide an exception to this rule – which permits a physical therapist to delegate certain patient care activities to an unlicensed assistant – this exception only applies if the unlicensed assistant works under the direct supervision of a physical therapist.

42. Health care practices in Florida may not collect PIP Benefits for: (i) massage; (ii) any services performed by massage therapists; or (iii) physical therapy services that are performed

9

by unlicensed individuals without direct supervision by a licensed physical therapist. Thus, any such charges submitted by a health care provider are unlawful and noncompensable.

43.     Pursuant to the No-Fault Law, insurers such as GEICO are not required to pay PIP Benefits:

(i)     for any service or treatment that is "upcoded", meaning that the service or treatment is billed using a billing code that would result in payment greater in amount than would be paid by using a billing code that accurately describes the service or treatment performed;

(ii)    to any person who knowingly submits a false or misleading statement relating to the claim or charges; or

(iii)   with respect to a bill or statement that does not substantially meet the billing requirements as set forth in the No-Fault Law.

44.     The No-Fault Law's billing requirements provide – among other things – that all PIP billing must, to the extent applicable, comply with the instructions promulgated by the Centers for Medicare and Medicaid Services ("CMS") for the completion of HCFA-1500 forms, as well as the guidelines promulgated by the American Medical Association ("AMA") in connection with the use of current procedural terminology ("CPT") codes that are used to bill for health care services.

45.     In turn, the instructions promulgated by CMS for the completion of HCFA-1500 forms require, among other things, that all HCFA-1500 forms set forth – in Box 31 – the identity of the individual health care practitioner who personally performed or directly supervised the underlying health care services.

46.     To "directly supervise" a service, a supervising health care practitioner "must be present in the office suite and [be] immediately available to furnish assistance and direction throughout the performance of the procedure. It does not mean that the physician (or other supervising practitioner) must be present in the room when the procedure is performed."

10

47. Additionally, pursuant to the No-Fault Law, in order for a health care service to be eligible for PIP reimbursement, the applicable HCFA-1500 claim form must set forth the professional license number of the provider who personally performed or directly supervised the underlying health care service, in the line or space provided for "Signature of Physician or Supplier, Including Degrees or Credentials."

48. Insurers are not required to pay PIP Benefits to health care providers that misrepresent, in their billing, the identity of the individual health care practitioners who performed or directly supervised the underlying services.

## II. Defendants' Fraudulent and Unlawful Scheme

49. Since at least 2019, and continuing through the present day, Defendants devised and implemented a fraudulent and unlawful scheme pursuant to which they billed GEICO millions of dollars for unlawful, medically unnecessary, illusory, and otherwise non-reimbursable services.

## A. Defendants' Violations of the Clinic Act

50. As part of the Defendants' fraudulent and unlawful scheme, Alfonso operated Alfonso, P.A. in pervasive violation of the Clinic Act.

51. Alfonso, P.A. was a "clinic" within the meaning of the Clinic Act, in that it was an entity "where health care services [were] provided to individuals and which tender[ed] charges for reimbursement for services."

52. However, Alfonso, P.A. never had a clinic license or a medical director.

53. Instead, Alfonso, P.A. was owned by Alfonso, a licensed chiropractor, and therefore purported to qualify for the "wholly owned" exemption from the Clinic Act's clinic licensing, operating, and medical director requirements.

54. However, Alfonso, P.A. could only qualify for the "wholly owned" exemption if it was owned by a licensed health care practitioner who legitimately supervised its business activities and remained legally responsible for its compliance with all federal and state laws.

55. Alfonso never legitimately supervised the business activities of Alfonso, P.A., inasmuch as Alfonso directed the submission of the fraudulent and unlawful charges through Alfonso, P.A. to GEICO and other insurers.

56. Indeed, given the fraudulent treatment and billing activities described below – which were pervasive across all of the billing submitted to GEICO through Alfonso, P.A. – there is no way that Alfonso could have legitimately supervised the business activities of the practice.

57. Alfonso could not have legitimately supervised the business activities of Alfonso, P.A. in any case, because Alfonso, P.A. purported to provide medical services, including purported medical examinations by Lopez, that were beyond the scope of Alfonso's chiropractic license.

58. Had Alfonso legitimately supervised the business activities of Alfonso, P.A., he would not have permitted Alfonso, P.A. to operate in pervasive violation of Florida law, including the Clinic Act, the Physical Therapy Act, the No-Fault Law, and the False and Fraudulent Insurance Claims Statute.

59. Had Alfonso legitimately supervised the business activities of Alfonso, P.A., he would not have permitted Alfonso, P.A. to misrepresent the nature, extent, medical necessity, or results of its purported health care services, as set forth herein.

60. Accordingly, Alfonso, P.A. never qualified for the "wholly owned" exemption from licensure as a "health care clinic" set forth in Section 400.9905(4)(g). Nor did Alfonso, P.A. qualify for any other exemption to the Clinic Act, or have a medical director as required for a

12

health care clinic without an exemption. As a result, Alfonso, P.A. operated – at all relevant times – in violation of the Clinic Act.

**B.      Defendants' Unlawful Billing for Physical Therapy Services Performed by Massage Therapists and Unlicensed/Unsupervised Individuals, and Misrepresentations Regarding the Identity of the Treating Practitioners**

61.      What is more, and in keeping with the fact that Alfonso did not legitimately supervise the business activities of Alfonso, P.A., the purported "physical therapy" services in the claims identified in Exhibit "1" were unlawfully performed – the extent they were performed at all – by massage therapists and by unlicensed/unsupervised individuals.

62.      Upon information and belief based on publicly-available information, including database searches, the massage therapists who performed the purported "physical therapy" services at Alfonso, P.A. included, but were not limited to, individuals named Danys Arteaga, L.M.T., Yaily Duque Mildstein, L.M.T., Teresa Gonzales, L.M.T., Santiesteban Fornari Rene, L.M.T., Breto Leysgel, L.M.T., and Perez Tahimi, L.M.T., among others.

63.      The No-Fault Law and the Florida Physical Therapy Act prohibited Alfonso, P.A. from recovering PIP Benefits for services – including but not limited to physical therapy services – provided by massage therapists and unlicensed/unsupervised individuals.

64.      Defendants were aware of the fact that Alfonso, P.A. could not legally recover PIP Benefits for services performed by massage therapists and unlicensed/unsupervised individuals.

65.      Accordingly, in the claims for physical therapy services identified in Exhibit "1", in an attempt to conceal the fact that the "physical therapy" services provided by Alfonso, P.A. had been performed by massage therapists and unlicensed/unsupervised individuals, and make it appear as if the services were eligible for PIP reimbursement, Defendants: (i) virtually always falsely represented, in Box 31 of the HCFA-1500 forms that they used to bill for the services, that

13

a chiropractor associated with Alfonso, P.A., usually Alfonso himself, performed or at least directly supervised the services; and (ii) did not include the names of the massage therapists and unlicensed/unsupervised individuals on the HCFA-1500 forms they used to bill for the services.

66. In keeping with the fact that Alfonso did not legitimately perform or directly supervise the purported physical therapy services billed through Alfonso, P.A., the "physical therapy" services that were billed through Alfonso, P.A. were medically unnecessary, inasmuch as the Insureds were given substantially-similar physical therapy treatment plans at Alfonso, P.A., which were not tailored to each individual patient's individual circumstances, presentation, and symptomatology, which in turn is at odds with the standard of care for physical or rehabilitative medicine.

67. Furthermore, and also in keeping with the fact that Alfonso did not legitimately perform or directly supervise the "physical therapy" services that were billed through Alfonso, P.A. to GEICO, Defendants routinely falsely represented, in the billing they submitted or caused to be submitted through Alfonso, P.A. to GEICO for physical therapy services, between 2018 and the present, that Alfonso personally performed or directly supervised a non-credible number of physical therapy services on individual dates.

68. For instance:

(i) On February 18, 2020, Alfonso, P.A. and Alfonso purported to provide at least 61 individual physical therapy services to at least 13 individual Insureds, at two different locations, and falsely contended in the resulting bills to GEICO that Alfonso personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 15.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.

(ii) On February 22, 2022, Alfonso, P.A. and Alfonso purported to provide at least 66 individual physical therapy services to at least 13 individual Insureds, at two different locations, and falsely contended in the resulting bills to GEICO that Alfonso personally performed or at least directly supervised every one of those

14

treatments. What is more, those putative treatments included at least 16.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.

(iii)   On February 28, 2022, Alfonso, P.A. and Alfonso purported to provide at least 87 individual physical therapy services to at least 16 individual Insureds, at two different locations, and falsely contended in the resulting bills to GEICO that Alfonso personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 21.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.

(iv)   On March 8, 2022, Alfonso, P.A. and Alfonso purported to provide at least 70 individual physical therapy services to at least 16 individual Insureds, at two different locations, and falsely contended in the resulting bills to GEICO that Alfonso personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 17.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.

(v)   On March 14, 2022, Alfonso, P.A. and Alfonso purported to provide at least 70 individual physical therapy services to at least 14 individual Insureds, at two different locations, and falsely contended in the resulting bills to GEICO that Alfonso personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 17.5 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.

(vi)   On April 5, 2022, Alfonso, P.A. and Alfonso purported to provide at least 71 individual physical therapy services to at least 15 individual Insureds, at two different locations, and falsely contended in the resulting bills to GEICO that Alfonso personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 17.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.

(vii)   On April 11, 2022, Alfonso, P.A. and Alfonso purported to provide at least 83 individual physical therapy services to at least 16 individual Insureds, at two different locations, and falsely contended in the resulting bills to GEICO that Alfonso personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 20.75 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.

(viii)   On April 13, 2022, Alfonso, P.A. and Alfonso purported to provide at least 83 individual physical therapy services to at least 16 individual Insureds, at two

15

different locations, and falsely contended in the resulting bills to GEICO that Alfonso personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 20 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.

(ix)   On April 19, 2022, Alfonso, P.A. and Alfonso purported to provide at least 73 individual physical therapy services to at least 15 individual Insureds, at two different locations, and falsely contended in the resulting bills to GEICO that Alfonso personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 18.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.

(x)   On April 25, 2022, Alfonso, P.A. and Alfonso purported to provide at least 73 individual physical therapy services to at least 13 individual Insureds, at two different locations, and falsely contended in the resulting bills to GEICO that Alfonso personally performed or at least directly supervised every one of those treatments. What is more, those putative treatments included at least 18.25 hours of physical therapy services that required direct, one-on-one patient contact between the treating provider and the Insureds throughout the services.

69.   These are only representative examples. In the claims for physical therapy services that are identified in Exhibit "1", Defendants routinely falsely that Alfonso had performed – or at least directly supervised – a non-credible number of physical therapy services on individual dates.

70.   Furthermore, upon information and belief, the fraudulent and unlawful billing for physical therapy services that Defendants submitted through Alfonso, P.A. to GEICO constituted only a fraction of the total fraudulent and unlawful billing for physical therapy services that Defendants submitted through Alfonso, P.A. to all of the automobile insurers in the Florida automobile insurance market.

71.   GEICO is only one of the automobile insurance companies doing business in the Florida automobile insurance market.

72.     It is extremely improbable, to the point of impossibility, that Defendants only submitted fraudulent and unlawful billing to GEICO, and that Defendants did not simultaneously bill other automobile insurers.

73.     Thus, upon information and belief, the non-credible number of physical therapy services that Alfonso purported to perform or directly supervise for GEICO Insureds at Alfonso, P.A. on individual dates of service, including the dates of service identified above, constituted only a fraction of the total number of physical therapy services that Alfonso purported to directly supervise or provide at Alfonso, P.A., including to individuals Insured by companies other than GEICO, on those same dates of service.

74.     In the claims for physical therapy services identified in Exhibit "1", Defendants routinely fraudulently misrepresented that the physical therapy services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i)     the purported physical therapy services were performed – to the extent that they were performed at all – by massage therapists and unlicensed/unsupervised individuals, in contravention of Florida law;

(ii)    Defendants could not lawfully recover PIP Benefits for the purported physical therapy services, because they were performed by massage therapists and unlicensed/unsupervised individuals; and

(iii)   Defendants systematically fraudulently misrepresented and concealed the identities of the individuals who either personally performed or directly supervised the putative physical therapy services.

75.     In this context, Alfonso – who at all relevant times purported to own Alfonso, P.A. – did not, and could not have, legitimately supervised the business activities of Alfonso, P.A.

76.     Had Alfonso legitimately supervised the business activities of Alfonso, P.A., Alfonso would not have permitted Alfonso, P.A. to bill insurers for "physical therapy" services that had been performed by massage therapists and unlicensed/unsupervised individuals. Nor

17

would Alfonso have permitted Alfonso, P.A. to falsely represent that he had performed or directly supervised the services.

**C.      Defendants' Unlawful General Business Practice of Failing to Make a Good Faith Effort to Collect Deductibles from Their Patients**

77.      Defendants knew that, if they made a legitimate, good-faith effort to collect PIP deductibles from their patients, it would impede their ability to carry out the fraudulent and unlawful schemes described herein. For instance, if Defendants made legitimate efforts to collect deductibles, Insureds would be less likely to continue presenting to Alfonso, P.A. for medically unnecessary treatments.

78.      Accordingly, as part and parcel of their fraudulent and unlawful scheme, Defendants unlawfully engaged in the general business practice of waiving – or failing to make a good-faith effort to collect – PIP deductibles from their patients, in violation of the False and Fraudulent Insurance Claims Statute.

79.      In keeping with this fact, in virtually all of the thousands of bills (i.e., the HCFA-1500 forms) submitted through Alfonso, P.A. to GEICO for Defendants' Fraudulent Services, Defendants represented that they did not collect any money, whether it be a copayment or deductible, from the patients.

80.      In the claims identified in Exhibit "1", Defendants routinely falsely represented that the underlying health care services were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable because Defendants engaged in the unlawful general business practice of waiving, or failing to make a good-faith effort to collect, co-payments and deductibles from their patients in violation of the False and Fraudulent Insurance Claims Statute.

18

81.     In this context, Alfonso – who at all relevant times purported to own Alfonso, P.A.– did not, and could not have, legitimately supervised the business activities of Alfonso, P.A.

82.     Had Alfonso legitimately supervised the business activities of Alfonso, P.A., Alfonso would have ensured – among other things – that Alfonso, P.A. complied with the False and Fraudulent Insurance Claims Statute.

**D.      Defendants' Fraudulent Treatment and Billing Protocol**

83.     In the claims identified in Exhibit "1", almost none of the Insureds whom Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced.

84.     Even so, in the claims identified in Exhibit "1", Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" that was provided pursuant to a pre-determined fraudulent protocol designed to maximize the billing that they could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to the "treatment".

85.     Defendants purported to provide their pre-determined fraudulent treatment protocol to the Insureds in the claims identified in Exhibit "1" without regard for the Insureds' individual symptoms or presentation, or – in most cases – the total absence of any actual continuing medical problem arising from any actual automobile accidents.

86.     Each step in Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

19

87. No legitimate chiropractor, physician, or health care practice would permit the fraudulent treatment and billing protocol described below to proceed under his, her, or its auspices.

88. Defendants permitted the fraudulent treatment and billing protocol designed below to proceed under their auspices because: (i) Alfonso, P.A. was, at all relevant times, operating in violation of the Clinic Act, without legitimate oversight by Alfonso; and (ii) Defendants sought to profit from the fraudulent billing they submitted to GEICO and other insurers.

**1. The Fraudulent and Unlawful Claims for Initial Examinations at Alfonso, P.A.**

89. As an initial step in Defendants' fraudulent treatment and billing protocol, Alfonso and Alfonso, P.A. purported to provide the Insureds in the claims identified in Exhibit "1" with initial examinations.

90. The examinations purportedly were performed by Alfonso.

91. As set forth in Exhibit "1", Defendants then virtually always billed the initial examinations to GEICO under CPT code 99204, typically resulting in a charge of between $492.00 and $600.00 for each putative examination.

92. Pursuant to the American Medical Association's CPT Assistant, which governs the use of CPT codes used to bill for PIP claims, the use of CPT code 99204 to bill for an initial examination typically represents that the patient presented with problems of moderate to high severity.

93. The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99204 for an initial patient examination.

94.     For example, the CPT Assistant provides the following clinical examples of presenting problems that support the use of CPT code 99204 to bill for an initial patient examination:

(i)      Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)     Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)    Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)     Initial office visit for a 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)      Initial office visit for a 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)     Initial office evaluation of a 70-year-old female with polyarthralgia. (Rheumatology)

(vii)    Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

95.     Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99204 to bill for an initial patient examination typically are problems that pose a serious threat to a patient's health, or even the patient's life.

96.     Moreover, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician or chiropractor who performed the examination spent at least 45 minutes of total time performing the examination.

97.     Additionally, pursuant to the CPT Assistant, the use of CPT code 99204 to bill for a patient examination represents that the physician or chiropractor who performed the examination

21

engaged in legitimate "moderate complexity" medical decision-making in connection with the examination.

98.     In the claims for initial examinations identified in Exhibit "1", the charges for the initial examinations were fraudulent in that they misrepresented Defendants' eligibility to collect PIP Benefits in the first instance.

99.     In fact, Defendants never were eligible to collect PIP Benefits, inasmuch as they operated in violation of Florida law.

100.    Moreover, as set forth below, the charges for the initial examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the extent, nature, results, and medical necessity of the initial examinations.

**a.       Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

101.    To the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their typically-minor automobile accidents, the problems virtually always were minimal severity soft tissue injuries such as sprains and strains.

102.    For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "1" either had no presenting problems at all as the result of their relatively minor automobile accidents, or else problems of minimal severity, in most of the claims identified in Exhibit "1" the contemporaneous police reports indicated that the underlying accidents involved relatively low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

103.    What is more, in most of the claims identified in Exhibit "1" the Insureds did not seek treatment at any hospital as the result of their accidents.

22

104.     To the limited extent that the Insureds in the claims identified in Exhibit "1" did seek treatment at a hospital following their accidents, they almost always were briefly observed on an outpatient basis, and then discharged with nothing more serious than a minor soft tissue injury diagnosis.

105.     Even so, when billing GEICO for initial examinations using CPT code 99204 in the claims identified in Exhibit "1", Defendants falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were minimal severity soft tissue injuries such as sprains and strains, to the limited extent that they had any presenting problems at all at the time of the examinations.

106.     For example:

(i)     On February 24, 2023, an Insured named GG was involved in an automobile accident. The contemporaneous police report indicated that GG's vehicle was drivable following the accident. The police report further indicated that GG was not injured as a result of the accident. In keeping with the fact that GG was not seriously injured as a result of the accident, GG was not transported to any hospital emergency department following the accident. To the extent that GG experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination on February 27, 2023, Alfonso, P.A. and Alfonso billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that GG presented with problems of moderate to high severity.

(ii)     On March 30, 2023, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured as a result of the accident. In keeping with the fact that MC was not seriously injured as a result of the accident, MC was not transported to any hospital emergency department following the accident. To the extent that MC experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination on April 10, 2023, Alfonso, P.A. and Alfonso billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that MC presented with problems of moderate to high severity.

(iii)     On June 28, 2023, an Insured named DC was involved in an automobile accident. The contemporaneous police report indicated that DC's vehicle was drivable

23

following the accident. The police report further indicated that DC was not injured as a result of the accident. In keeping with the fact that DC was not seriously injured as a result of the accident, DC was not transported to any hospital emergency department following the accident. To the extent that DC experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination on July 11, 2023, Alfonso, P.A. and Alfonso billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that DC presented with problems of moderate to high severity.

(iv)    On July 26, 2023, an Insured named MH was involved in an automobile accident. The contemporaneous police report indicated that MH's vehicle was drivable following the accident. The police report further indicated that MH was not injured as a result of the accident. In keeping with the fact that MH was not seriously injured as a result of the accident, MH was not transported to any hospital emergency department following the accident. To the extent that MH experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination on February 21, 2025, Alfonso, P.A. and Alfonso billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that MH presented with problems of moderate to high severity.

(v)    On August 5, 2023, an Insured named SP was involved in an automobile accident. The contemporaneous police report indicated that SP's vehicle was drivable following the accident. The police report further indicated that SP was not injured as a result of the accident. In keeping with the fact that SP was not seriously injured as a result of the accident, SP was not transported to any hospital emergency department following the accident. To the extent that SP experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination on August 15, 2023, Alfonso, P.A. and Alfonso billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that SP presented with problems of moderate to high severity.

(vi)    On January 7, 2024, an Insured named GO was involved in an automobile accident. The contemporaneous police report indicated that GO's vehicle was drivable following the accident. The police report further indicated that GO was not injured as a result of the accident. In keeping with the fact that GO was not seriously injured as a result of the accident, GO was not transported to any hospital emergency department following the accident. To the extent that FC experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination on January 19, 2025, Alfonso, P.A. and Alfonso billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that GO presented with problems of moderate to high severity.

24

(vii)   On February 21, 2024, an Insured named MT was involved in an automobile accident. The contemporaneous police report indicated that MT's vehicle was drivable following the accident. The police report further indicated that MT was not injured as a result of the accident. In keeping with the fact that MT was not seriously injured as a result of the accident, MT was not transported to any hospital emergency department following the accident. To the extent that MT experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination on February 27, 2024, Alfonso, P.A. and Alfonso billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that MT presented with problems of moderate to high severity.

(viii)  On April 11, 2024, an Insured named FC was involved in an automobile accident. The contemporaneous police report indicated that FC's vehicle was drivable following the accident. The police report further indicated that FC was not injured as a result of the accident. In keeping with the fact that FC was not seriously injured as a result of the accident, FC was not transported to any hospital emergency department following the accident. To the extent that FC experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination on April 15, 2024, Alfonso, P.A. and Alfonso billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that FC presented with problems of moderate to high severity.

(ix)    On April 26, 2024, an Insured named AG was involved in an automobile accident. The contemporaneous police report indicated that AG's vehicle was drivable following the accident. The police report further indicated that AG was not injured as a result of the accident. In keeping with the fact that AG was not seriously injured as a result of the accident, AG was not transported to any hospital emergency department following the accident. To the extent that AG experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination on May 3, 2024, Alfonso, P.A. and Alfonso billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that AG presented with problems of moderate to high severity.

(x)     On February 20, 2025, an Insured named GL was involved in an automobile accident. The contemporaneous police report indicated that GL's vehicle was drivable following the accident. The police report further indicated that GL was not injured as a result of the accident. In keeping with the fact that GL was not seriously injured as a result of the accident, GL was not transported to any hospital emergency department following the accident. To the extent that GL experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, following a purported initial examination on February 21, 2025, Alfonso, P.A. and Alfonso billed GEICO for the initial examination using CPT code 99204,

25

and thereby falsely represented that GL presented with problems of moderate to high severity.

107. These are only representative examples. In the claims for initial examinations identified in Exhibit "1", Defendants routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to: (i) create a false basis for their charges for the putative examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at a higher rate than examinations involving presenting problems of low severity, minimal severity, or no severity; and (ii) create a false basis for the other Fraudulent Services that Defendants purported to provide to the Insureds.

**b.      Misrepresentation Regarding the Amount of Time Spent on the Initial Examinations**

108. What is more, in the claims for initial examinations that are identified in Exhibit "1", Defendants routinely misrepresented and exaggerated the amount of time that the examining chiropractor – namely Alfonso – spent performing the examinations.

109. As set forth in Exhibit "1", Defendants virtually always billed for the putative initial examinations using CPT code 99204, and thereby represented that Alfonso spent at least 45 minutes performing the putative examinations.

110. In fact, in the claims for initial examinations identified in Exhibit "1", Alfonso did not spend more than 15 minutes – let alone 45 minutes – of time purporting to perform the examinations.

111. For instance, and in keeping with the fact that the initial examinations in the claims identified in Exhibit "1" did not take more than 15 minutes to perform, Alfonso used a template in purporting to conduct the initial examinations.

112.     The template that Alfonso used in purporting to conduct the initial examinations set forth a limited range of examination parameters, including brief patient interviews and limited examinations of the Insureds' musculoskeletal systems.

113.     These brief patient interviews and limited examinations did not require Alfonso to spend more than 15 minutes of time on the examinations, to the extent that they were even provided at all.

114.     In the claims for initial examinations that are identified in Exhibit "1", Defendants routinely misrepresented the amount of time that was spent conducting the initial examinations because lengthier examinations that are billable under CPT code 99204 are reimbursable at higher rates than examinations that take less time to perform.

**c.     Misrepresentations Regarding the Extent of Decision Making**

115.     Furthermore, in the claims for initial examinations identified in Exhibit "1", when Defendants billed GEICO for the purported examinations using CPT code 99204, they falsely represented that Alfonso engaged in some legitimate, "moderate complexity" medical decision-making in connection with the examinations.

116.     Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information to be considered; and (iii) the risk of complications, morbidity, and mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

117.     For an initial patient examination to legitimately entail "moderate complexity" medical decision-making, the examination typically must – among other things – involve: (i)

chronic illness, acute illness with systemic symptoms or complications, or an undiagnosed problem with an uncertain prognosis; (ii) review and analysis of a significant amount of the patient's medical records/history; and (iii) at least a moderate risk of morbidity associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options for the patient.

118.    However, to the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their typically minor automobile accidents, the problems virtually always were minor soft tissue injuries such as sprains and strains.

119.    The diagnosis and treatment of these minor soft tissue injuries did not require any legitimate moderate complexity medical decision-making.

120.    First, in Defendants' claims for initial examinations identified in Exhibit "1", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

121.    When the Insureds in the claims identified in Exhibit "1" presented to Defendants for "treatment", they did not arrive with any significant medical records.

122.    Furthermore, prior to the initial examinations, Defendants and their associates did not request any significant medical records from any other providers regarding the Insureds, nor did they provide, review, or analyze any complex diagnostic tests or other information in connection with the examinations.

123.    Second, in Defendants' claims for initial examinations identified in Exhibit "1", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft tissue complaints.

124. Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by Defendants during the initial examinations.

125. In virtually all of the claims identified in Exhibit "1", any diagnostic procedures and treatment options that Defendants recommended or provided during the initial examinations were limited to a series of medically unnecessary follow-up examinations, physical therapy, ESWT, and related services and goods – none of which was health- or life-threatening if properly administered.

126. Third, in the claims for initial examinations identified in Exhibit "1", Defendants did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

127. Rather, to the extent that the initial examinations were conducted in the first instance, Defendants provided a substantially similar, pre-determined, and false series of soft tissue injury "diagnoses" for each Insured, and prescribed a substantially similar course of medically unnecessary treatment for each Insured.

128. Specifically, in almost every instance in the claims identified in Exhibit "1", during the initial examinations, the Insureds did not report any serious continuing medical problems that legitimately could be traced to an underlying automobile accident.

129. Even so, Defendants prepared initial examination reports in which they provided false, boilerplate sprain/strain and similar soft tissue "diagnoses" to virtually every Insured.

130. Then, based upon these artificial "diagnoses", Defendants directed the Insureds to receive a series of medically unnecessary follow-up examinations, physical therapy, and related services and goods.

131.    For example:

(i)    On May 3, 2023, an Insured named OC was involved in an automobile accident. The contemporaneous police report indicated that OC's vehicle was drivable following the accident. The police report further indicated that OC was not injured as a result of the accident. In keeping with the fact that OC was not seriously injured as a result of the accident, OC was not transported to any hospital emergency department following the accident. To the extent that OC experienced any health problems at all as a result of the accident, they were of minimal severity. On May 17, 2023, Alfonso purported to provide an initial examination to OC at Alfonso, P.A. To the extent that Alfonso performed the examination in the first instance, Alfonso did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Alfonso did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Alfonso and Alfonso, P.A. provided OC with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither OC's presenting problems, nor the treatment plan provided to OC by Alfonso and Alfonso, P.A. presented any risk of significant complications, morbidity, or mortality. To the contrary, OC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Alfonso and Alfonso, P.A. consisted of medically unnecessary physical therapy services, which did not pose a significant risk to OC. Even so Alfonso and Alfonso, P.A. billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Alfonso engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ii)    On May 18, 2023, an Insured named CH was involved in an automobile accident. The contemporaneous police report indicated that CH's vehicle was drivable following the accident. The police report further indicated that CH was not injured as a result of the accident. In keeping with the fact that CH was not seriously injured as a result of the accident, CH was not transported to any hospital emergency department following the accident. To the extent that CH experienced any health problems at all as a result of the accident, they were of minimal severity. On May 25, 2023, Alfonso purported to provide an initial examination to CH at Alfonso, P.A. To the extent that Alfonso performed the examination in the first instance, Alfonso did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Alfonso did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Alfonso and Alfonso, P.A. provided CH with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither CH's presenting problems, nor the treatment plan provided to CH by Alfonso and Alfonso, P.A. presented any risk of significant complications, morbidity, or mortality. To the contrary, CH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Alfonso and

Alfonso, P.A. consisted of medically unnecessary physical therapy services, which did not pose a significant risk to CH. Even so Alfonso and Alfonso, P.A. billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Alfonso engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iii)   On September 21, 2023, an Insured named OP was involved in an automobile accident. The contemporaneous police report indicated that OP's vehicle was drivable following the accident. The police report further indicated that OP was not injured as a result of the accident. In keeping with the fact that OP was not seriously injured as a result of the accident, OP was not transported to any hospital emergency department following the accident. To the extent that OP experienced any health problems at all as a result of the accident, they were of minimal severity. On September 27, 2023, Alfonso purported to provide an initial examination to OP at Alfonso, P.A. To the extent that Alfonso performed the examination in the first instance, Alfonso did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Alfonso did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Alfonso and Alfonso, P.A. provided OP with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither OP's presenting problems, nor the treatment plan provided to OP by Alfonso and Alfonso, P.A. presented any risk of significant complications, morbidity, or mortality. To the contrary, OP did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Alfonso and Alfonso, P.A. consisted of medically unnecessary physical therapy services, which did not pose a significant risk to OP. Even so Alfonso and Alfonso, P.A. billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Alfonso engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iv)   On October 27, 2023, an Insured named MA was involved in an automobile accident. The contemporaneous police report indicated that MA's vehicle was drivable following the accident. The police report further indicated that MA was not injured as a result of the accident. In keeping with the fact that MA was not seriously injured as a result of the accident, MA was not transported to any hospital emergency department following the accident. To the extent that MA experienced any health problems at all as a result of the accident, they were of minimal severity. On November 6, 2023, Alfonso purported to provide an initial examination to MA at Alfonso, P.A. To the extent that Alfonso performed the examination in the first instance, Alfonso did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Alfonso did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Alfonso and Alfonso, P.A. provided MA with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured.

31

Furthermore, neither MA's presenting problems, nor the treatment plan provided to MA by Alfonso and Alfonso, P.A. presented any risk of significant complications, morbidity, or mortality. To the contrary, MA did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Alfonso and Alfonso, P.A. consisted of medically unnecessary physical therapy services, which did not pose a significant risk to MA. Even so Alfonso and Alfonso, P.A. billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Alfonso engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(v)   On November 15, 2023, an Insured named PM was involved in an automobile accident. The contemporaneous police report indicated that PM's vehicle was drivable following the accident. The police report further indicated that PM was not injured as a result of the accident. In keeping with the fact that PM was not seriously injured as a result of the accident, PM was not transported to any hospital emergency department following the accident. To the extent that PM experienced any health problems at all as a result of the accident, they were of minimal severity. On November 28, 2023, Alfonso purported to provide an initial examination to PM at Alfonso, P.A. To the extent that Alfonso performed the examination in the first instance, Alfonso did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Alfonso did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Alfonso and Alfonso, P.A. provided PM with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither PM's presenting problems, nor the treatment plan provided to CH by Alfonso and Alfonso, P.A. presented any risk of significant complications, morbidity, or mortality. To the contrary, PM did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Alfonso and Alfonso, P.A. consisted of medically unnecessary physical therapy services, which did not pose a significant risk to PM. Even so Alfonso and Alfonso, P.A. billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Alfonso engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vi)  On February 10, 2024, an Insured named RC was involved in an automobile accident. The contemporaneous police report indicated that RC's vehicle was drivable following the accident. The police report further indicated that RC was not injured as a result of the accident. In keeping with the fact that RC was not seriously injured as a result of the accident, RC was not transported to any hospital emergency department following the accident. To the extent that RC experienced any health problems at all as a result of the accident, they were of minimal severity. On February 21, 2024, Alfonso purported to provide an initial examination to RC at Alfonso, P.A. To the extent that Alfonso performed the examination in the first instance, Alfonso did not retrieve, review, or analyze any significant amount of

medical records, diagnostic tests, or other information in connection with the examination. Moreover, Alfonso did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Alfonso and Alfonso, P.A. provided RC with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither RC's presenting problems, nor the treatment plan provided to RC by Alfonso and Alfonso, P.A. presented any risk of significant complications, morbidity, or mortality. To the contrary, RC did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Alfonso and Alfonso, P.A. consisted of medically unnecessary physical therapy services, which did not pose a significant risk to RC. Even so Alfonso and Alfonso, P.A. billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Alfonso engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vii) On August 21, 2024, an Insured named JA was involved in an automobile accident. The contemporaneous police report indicated that JA's vehicle was drivable following the accident. The police report further indicated that JA was not injured as a result of the accident. In keeping with the fact that JA was not seriously injured as a result of the accident, JA was not transported to any hospital emergency department following the accident. To the extent that JA experienced any health problems at all as a result of the accident, they were of minimal severity. On August 24, 2024, Alfonso purported to provide an initial examination to JA at Alfonso, P.A. To the extent that Alfonso performed the examination in the first instance, Alfonso did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Alfonso did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Alfonso and Alfonso, P.A. provided JA with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither JA's presenting problems, nor the treatment plan provided to JA by Alfonso and Alfonso, P.A. presented any risk of significant complications, morbidity, or mortality. To the contrary, JA did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Alfonso and Alfonso, P.A. consisted of medically unnecessary physical therapy services, which did not pose a significant risk to JA. Even so Alfonso and Alfonso, P.A. billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Alfonso engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(viii) On October 21, 2024, an Insured named LA was involved in an automobile accident. The contemporaneous police report indicated that LA's vehicle was drivable following the accident. The police report further indicated that LA was not injured as a result of the accident. In keeping with the fact that LA was not seriously injured as a result of the accident, LA was not transported to any hospital emergency department following the accident. To the extent that LA experienced

33

any health problems at all as a result of the accident, they were of minimal severity. On October 24, 2024, Alfonso purported to provide an initial examination to LA at Alfonso, P.A. To the extent that Alfonso performed the examination in the first instance, Alfonso did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Alfonso did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Alfonso and Alfonso, P.A. provided LA with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither LA's presenting problems, nor the treatment plan provided to LA by Alfonso and Alfonso, P.A. presented any risk of significant complications, morbidity, or mortality. To the contrary, LA did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Alfonso and Alfonso, P.A. consisted of medically unnecessary physical therapy services, which did not pose a significant risk to LA. Even so Alfonso and Alfonso, P.A. billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Alfonso engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ix)   On November 5, 2024, an Insured named JA was involved in an automobile accident. The contemporaneous police report indicated that JA's vehicle was drivable following the accident. The police report further indicated that JA was not injured as a result of the accident. In keeping with the fact that JA was not seriously injured as a result of the accident, JA was not transported to any hospital emergency department following the accident. To the extent that JA experienced any health problems at all as a result of the accident, they were of minimal severity. On November 6, 2024, Alfonso purported to provide an initial examination to JA at Alfonso, P.A. To the extent that Alfonso performed the examination in the first instance, Alfonso did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Alfonso did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Alfonso and Alfonso, P.A. provided JA with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither JA's presenting problems, nor the treatment plan provided to JA by Alfonso and Alfonso, P.A. presented any risk of significant complications, morbidity, or mortality. To the contrary, JA did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Alfonso and Alfonso, P.A. consisted of medically unnecessary physical therapy services, which did not pose a significant risk to JA. Even so Alfonso and Alfonso, P.A. billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Alfonso engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(x)   On February 26, 2025, an Insured named KH was involved in an automobile accident. The contemporaneous police report indicated that KH's vehicle was

drivable following the accident. The police report further indicated that KH was not injured as a result of the accident. In keeping with the fact that KH was not seriously injured as a result of the accident, KH was not transported to any hospital emergency department following the accident. To the extent that KH experienced any health problems at all as a result of the accident, they were of minimal severity. On March 11, 2025, Alfonso purported to provide an initial examination to KH at Alfonso, P.A. To the extent that Alfonso performed the examination in the first instance, Alfonso did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Alfonso did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Alfonso and Alfonso, P.A. provided KH with substantially the same, false, list of soft tissue injury "diagnoses" that they provided to virtually every other Insured. Furthermore, neither KH's presenting problems, nor the treatment plan provided to KH by Alfonso and Alfonso, P.A. presented any risk of significant complications, morbidity, or mortality. To the contrary, KH did not need any significant treatment at all as a result of the accident, and the treatment plan provided by Alfonso and Alfonso, P.A. consisted of medically unnecessary physical therapy services, which did not pose a significant risk to KH. Even so Alfonso and Alfonso, P.A. billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Alfonso engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

132. These are only representative examples. In the claims identified in Exhibit "1", Alfonso, P.A. and Alfonso routinely falsely represented that the purported examinations involved legitimate moderate-complexity decision-making, when in fact they did not involve any legitimate medical decision-making at all.

133. There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

134. An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

135. As set forth above, in the claims identified in Exhibit "1", almost all of the Insureds who purportedly received treatment at Alfonso, P.A. were involved in relatively minor accidents.

35

136. It is improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "1" would suffer substantially similar injuries as the result of their accidents, or require a substantially similar course of treatment.

137. It likewise is improbable that two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "1" would present for an initial examination with substantially similar symptoms, and receive substantially similar diagnoses, on or about the exact same date after their underlying automobile accident.

138. It is even more improbable – to the point of impossibility – that this would occur with great frequency within a cohort of patients treating at an individual health care practice such as Alfonso, P.A.

139. Even so, and in keeping with the fact that these putative "diagnoses" were pre-determined and false, Alfonso, P.A., Alfonso, and their associates working at their direction, frequently issued substantially similar, false "diagnoses", on or about the same date, to two or more Insureds who had been involved in the same underlying accident, and recommended a substantially similar course of medically unnecessary "treatment" to the Insureds, despite the fact that they were differently situated.

140. For example:

(i) On July 31, 2020, two Insureds – IR and LV – were involved in the same automobile accident. Thereafter, IR and LV presented on the same exact date, August 3, 2020, to Alfonso, P.A. for initial examinations. IR and LV were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that IR and LV suffered any injuries at all in their accident, the injuries were different. Even so, Alfonso, P.A. and Alfonso provided IR and LV with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(ii) On February 15, 2021, two Insureds – PL and ML – were involved in the same automobile accident. Thereafter, PL and ML presented on the same exact date, February 18, 2022, to Alfonso, P.A. for initial examinations. PL and ML were

different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that PL and ML suffered any injuries at all in their accident, the injuries were different. Even so, Alfonso, P.A. and Alfonso provided PL and ML with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(iii)   On March 15, 2022, two Insureds – EM and AM – were involved in the same automobile accident. Thereafter, EM and AM presented on the same exact date, March 16, 2022, to Alfonso, P.A. for initial examinations. EM and AM were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that EM and AM suffered any injuries at all in their accident, the injuries were different. Even so, Alfonso, P.A. and Alfonso provided EM and AM with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(iv)   On May 11, 2022, two Insureds – AS and JS – were involved in the same automobile accident. Thereafter, AS and JS presented on the same exact date, May 12, 2022, to Alfonso, P.A. for initial examinations. AS and JS were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AS and JS suffered any injuries at all in their accident, the injuries were different. Even so, Alfonso, P.A. and Alfonso provided AS and JS with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(v)   On May 20, 2022, three Insureds – BB, ST, and YT – were involved in the same automobile accident. Thereafter, BB, ST, and YT presented on the same exact date, May 24, 2022, to Alfonso, P.A. for initial examinations. BB, ST, and YT were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that BB, ST, and YT suffered any injuries at all in their accident, the injuries were different. Even so, Alfonso, P.A. and Alfonso provided BB, ST, and YT with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for each of them.

(vi)   On May 25, 2022, three Insureds – SM, MA, and JA – were involved in the same automobile accident. Thereafter, SM, MA, and JA presented on the same exact date, June 27, 2022, to Alfonso, P.A. for initial examinations. SM, MA, and JA were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that SM, MA, and JA suffered any injuries at all in their accident, the injuries were different. Even so, Alfonso, P.A. and Alfonso provided SM, MA, and JA with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for each of them.

(vii)   On November 2, 2022, two Insureds – KF and MF – were involved in the same automobile accident. Thereafter, KF and MF presented on the same exact date, November 4, 2022, to Alfonso, P.A. for initial examinations. KF and MF were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that KF and MF suffered any injuries at all in their accident, the injuries were different. Even so, Alfonso, P.A. and Alfonso provided NK and DO with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(viii)   On June 15, 2023, two Insureds were involved in the same automobile accident. Thereafter, NC and JC presented – incredibly – on the same exact date, July 10, 2023, to Alfonso, P.A. for initial examinations. NC and JC were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that HM and MO suffered any injuries at all in their accident, the injuries were different. Even so, Alfonso, P.A. and Alfonso provided NC and JC with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(ix)   On June 28, 2023, two Insureds were involved in the same automobile accident. Thereafter, DC and CC presented – incredibly – on the same exact date, July 11, 2023, to Alfonso, P.A. for initial examinations. DC and CC were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that HM and MO suffered any injuries at all in their accident, the injuries were different. Even so, Alfonso, P.A. and Alfonso provided DC and CC with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(x)   On September 22, 2023, two Insureds were involved in the same automobile accident. Thereafter, IR and LV presented – incredibly – on the same exact date, September 28, 2023, to Alfonso, P.A. for initial examinations. HM and MO were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that HM and MO suffered any injuries at all in their accident, the injuries were different. Even so, Alfonso, P.A. and Alfonso provided HM and MO with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(xi)   On November 15, 2023, two Insureds were involved in the same automobile accident. Thereafter, SP and SZ presented – incredibly – on the same exact date, November 16, 2023, to Alfonso, P.A. for initial examinations. SP and SZ were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that SP and SZ suffered any injuries at all in their accident, the injuries were different. Even so, Alfonso, P.A. and Alfonso provided SP and SZ with substantially similar "diagnoses", and

recommended a substantially similar course of medically unnecessary treatment for both of them.

(xii)    On November 15, 2023, two Insureds were involved in the same automobile accident. Thereafter, FG and JP presented – incredibly – on the same exact date, November 21, 2023, to Alfonso, P.A. for initial examinations. FG and JP were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that FG and JP suffered any injuries at all in their accident, the injuries were different. Even so, Alfonso, P.A. and Alfonso provided FG and JP with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(xiii)   On February 20, 2024, two Insureds were involved in the same automobile accident. Thereafter, YC and KC presented – incredibly – on the same exact date, February 23, 2024, to Alfonso, P.A. for initial examinations. YC and KC were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that YC and KC suffered any injuries at all in their accident, the injuries were different. Even so, Alfonso, P.A. and Alfonso provided YC and KC with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(xiv)    On April 4, 2024, two Insureds were involved in the same automobile accident. Thereafter, NK and DO present – incredibly – on the same exact date, July 8, 2024, to Alfonso, P.A. for initial examinations. NK and DO were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that NK and DO suffered any injuries at all in their accident, the injuries were different. Even so, Alfonso, P.A. and Alfonso provided NK and DO with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

(xv)     On February 20, 2025, two Insureds were involved in the same automobile accident. Thereafter, GL and FR presented – incredibly – on the same exact date, February 21, 2025, to Alfonso, P.A. for initial examinations. GL and FR were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that GL and FR suffered any injuries at all in their accident, the injuries were different. Even so, Alfonso, P.A. and Alfonso provided GL and FR with substantially similar "diagnoses", and recommended a substantially similar course of medically unnecessary treatment for both of them.

141.    These are only representative examples. In the claims for initial examinations that are identified in Exhibit "1", Alfonso, P.A. and Alfonso frequently issued substantially similar

39

"diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially similar course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated and, in any case, did not require the treatment.

142. The false "diagnoses" contained within the initial examination reports were included to give the false impression that the initial examinations entailed some legitimate medical decision-making, to create a false basis for the charges under CPT code 99204, and to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

143. In the claims for initial examinations identified in Exhibit "1", Defendants routinely fraudulently misrepresented that the examinations were lawfully provided and eligible for PIP reimbursement, when in fact they were neither lawfully provided nor reimbursable, because:

(i) the putative examinations were illusory, with outcomes that were pre-determined to result in substantially similar, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii) the charges for the putative examinations misrepresented the nature, extent, and results of the examinations; and

(iii) Alfonso, P.A. and Alfonso were never eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they operated in violation of Florida law.

144. In this context, Alfonso – who at all relevant times purported to own and supervise Alfonso, P.A. – did not, and could not have, legitimately supervised the business activities of Alfonso, P.A.

145. Had Alfonso actually supervised the business activities of Alfonso, P.A., he would not have permitted Alfonso, P.A.'s billing to routinely fraudulently misrepresent that the putative

40

initial examinations were legitimately and lawfully performed and were eligible for reimbursement, when in fact they were not.

**2.      The Fraudulent and Unlawful Charges for Follow-Up Examinations at Alfonso, P.A.**

146.    Alfonso, P.A. and Alfonso also typically purported to subject the Insureds in the claims identified in Exhibit "1" to fraudulent follow-up examinations during the course of Defendants' fraudulent treatment and billing protocol.

147.    The follow-up examinations purportedly were performed by Alfonso.

148.    As set forth in Exhibit "1", Alfonso, P.A. and Alfonso then typically billed the purported follow-up examinations through Alfonso, P.A. to GEICO under: (i) CPT code 99214, virtually always resulting in a charge of between $350.00 to $750.00 for each putative follow-up examination; and (ii) CPT code 99215, virtually always resulting in a charge of between $500.00 to $750.00 for each putative follow-up examination.

149.    In the claims for follow-up examinations identified in Exhibit "1", the charges for the follow-up examinations were fraudulent in that they misrepresented Alfonso, P.A.'s eligibility to collect PIP Benefits in the first instance.

150.    In fact, and as set forth herein, Alfonso, P.A. and Alfonso never were eligible to collect PIP Benefits, inasmuch as they operated in violation of Florida law.

151.    As set forth below, Alfonso, P.A. and Alfonso's charges for the follow-up examinations identified in Exhibit "1" were also fraudulent in that they misrepresented the nature, extent, and results of the purported follow-up examinations.

**a.    Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

152.    Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination typically represents – among other things – that the patient presented with problems of moderate to high severity at the time of the examination.

153.    The CPT Assistant provides various clinical examples of moderate to high severity presenting problems that would support the use of CPT code 99214 to bill for a follow-up patient examination, namely:

(i)     Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)    Office evaluation of 28-year-old patient with regional enteritis, diarrhea, and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)   Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)    Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)     Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)    Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)   Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/Internal Medicine/Family Medicine)

(viii)  Office visit with a 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

154.    Accordingly, pursuant to the CPT Assistant, the moderate to high severity presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient

examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

155.    Pursuant to the CPT Assistant, the use of CPT code 99215 to bill for a follow-up patient examination typically represents that the Insured presented with problems of moderate to high severity.

156.    The CPT Assistant provides various clinical examples of moderate to high severity presenting problems that would support the use of CPT code 99215 to bill for a follow-up patient examination, namely:

(i)    Office visit with 30-year-old male, established patient 3-month history of fatigue, weight loss, intermittent fever, and presenting with diffuse adenopathy and splenomegaly. (Family Medicine)

(ii)    Office evaluation and discussion of treatment options for a 68-year-old male with a biopsy-proven rectal carcinoma. (General Surgery)

(iii)    Office visit for restaging of an established patient with new lymphadenopathy one year post therapy for lymphoma. (Hematology/Oncology)

(iv)    Follow-up office visit for a 65-year old male with a fever of recent onset while on outpatient antibiotic therapy for endocarditis. (Infectious Disease)

(v)    Office visit for evaluation of recent onset syncopal attacks in a 70-year-old woman, established patient. (Internal Medicine)

(vi)    Follow-up office visit for a 75-year-old patient with ALS (amyotrophic lateral sclerosis), who is no longer able to swallow. (Neurology)

(vii)    Follow-up visit, 40-year-old mother of 3, with acute rheumatoid arthritis, anatomical Stage 3, ARA function Class 3 rheumatoid arthritis, and deteriorating function. (Rheumatology)

157.    Accordingly, pursuant to the CPT Assistant, the moderate to high severity presenting problems that could support the use of CPT code 99215 to bill for a follow-up patient examination typically are problems that pose a critical threat to the patient's health, and even the patient's life.

43

158. However, to the extent that the Insureds in the claims identified in Exhibit "1" suffered any injuries at all in their automobile accidents, the injuries were virtually always minor soft tissue injures such as sprains and strains, which were of minimal severity, even at their onset.

159. Minor soft tissue injuries such as sprains and strains virtually always resolve after a short course of conservative treatment or no treatment at all. By the time the Insureds in the claims identified in Exhibit "1" presented for their putative follow-up examinations – typically weeks or months after their minor accidents – the Insureds either did not have any genuine presenting problems at all as a result of their minor automobile accidents, or else their presenting problems were minimal.

160. Even so, in the claims for the follow-up examinations under identified in Exhibit "1", Alfonso, P.A. and Alfonso represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were minimal severity soft tissue injures such as sprains and strains, to the limited extent that they had any presenting problems at all at the time of the purported examinations.

161. For example:

(i) On January 5, 2020, an Insured named LT was involved in an automobile accident. The contemporaneous police report indicated that LT's vehicle was drivable following the accident. The police report further indicated that LT was not injured as a result of the accident. In keeping with the fact that LT was not seriously injured as a result of the accident, LT was not transported to any hospital emergency department following the accident. To the extent that LT experienced any health problems at all as a result of the accident, they were of minimal severity, even at their onset, and improved over time. Even so, following a purported follow-up examination of LT on March 17, 2020 – over two months after the accident – Alfonso and Alfonso, P.A. billed for the follow-up examination using CPT code 99215, and thereby falsely represented that LT presented with problems of moderate to high severity.

(ii) On February 24, 2023, an Insured named GG was involved in an automobile accident. The contemporaneous police report indicated that GG's vehicle was drivable following the accident. The police report further indicated that GG was not

44

injured as a result of the accident. In keeping with the fact that GG was not seriously injured as a result of the accident, GG was not transported to any hospital emergency department following the accident. To the extent that GG experienced any health problems at all as a result of the accident, they were of minimal severity, even at their onset, and improved over time. Even so, following a purported follow-up examination of GG on April 26, 2023 – over two months after the accident – Alfonso and Alfonso, P.A. billed for the follow-up examination using CPT code 99215, and thereby falsely represented that GG presented with problems of moderate to high severity.

(iii)    On March 30, 2023, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured as a result of the accident. In keeping with the fact that MC was not seriously injured as a result of the accident, MC was not transported to any hospital emergency department following the accident. To the extent that MC experienced any health problems at all as a result of the accident, they were of minimal severity, even at their onset, and improved over time. Even so, following a purported follow-up examination of MC on June 6, 2023 – over two months after the accident – Alfonso and Alfonso, P.A. billed for the follow-up examination using CPT code 99215, and thereby falsely represented that MC presented with problems of moderate to high severity.

(iv)    On May 3, 2023, an Insured named OC was involved in an automobile accident. The contemporaneous police report indicated that OC's vehicle was drivable following the accident. The police report further indicated that OC was not injured as a result of the accident. In keeping with the fact that OC was not seriously injured as a result of the accident, OC was not transported to any hospital emergency department following the accident. To the extent that OC experienced any health problems at all as a result of the accident, they were of minimal severity, even at their onset, and improved over time. Even so, following a purported follow-up examination of OC on July 11, 2023 – over two months after the accident – Alfonso and Alfonso, P.A. billed for the follow-up examination using CPT code 99214, and thereby falsely represented that OC presented with problems of moderate to high severity.

(v)    On July 26, 2023, an Insured named MH was involved in an automobile accident. The contemporaneous police report indicated that MH's vehicle was drivable following the accident. The police report further indicated that MH was not injured as a result of the accident. In keeping with the fact that MH was not seriously injured as a result of the accident, MH was not transported to any hospital emergency department following the accident. To the extent that MH experienced any health problems at all as a result of the accident, they were of minimal severity, even at their onset, and improved over time. Even so, following a purported follow-up examination of MH on August 30, 2023 – over one month after the accident – Alfonso and Alfonso, P.A. billed for the follow-up examination using CPT code

99214, and thereby falsely represented that MH presented with problems of moderate to high severity.

(vi)   On August 5, 2023, an Insured named SP was involved in an automobile accident. The contemporaneous police report indicated that SP's vehicle was drivable following the accident. The police report further indicated that SP was not injured as a result of the accident. In keeping with the fact that SP was not seriously injured as a result of the accident, SP was not transported to any hospital emergency department following the accident. To the extent that SP experienced any health problems at all as a result of the accident, they were of minimal severity, even at their onset, and improved over time. Even so, following a purported follow-up examination of SP on September 28, 2023 – over one month after the accident – Alfonso and Alfonso, P.A. billed for the follow-up examination using CPT code 99215, and thereby falsely represented that SP presented with problems of moderate to high severity.

(vii)   On February 21, 2024, an Insured named MT was involved in an automobile accident. The contemporaneous police report indicated that MT's vehicle was drivable following the accident. The police report further indicated that MT was not injured as a result of the accident. In keeping with the fact that MT was not seriously injured as a result of the accident, MT was not transported to any hospital emergency department following the accident. To the extent that MT experienced any health problems at all as a result of the accident, they were of minimal severity, even at their onset, and improved over time. Even so, following a purported follow-up examination of MT on April 2, 2024 – over one month after the accident – Alfonso and Alfonso, P.A. billed for the follow-up examination using CPT code 99215, and thereby falsely represented that MT presented with problems of moderate to high severity.

(viii)   On April 11, 2024, an Insured named FC was involved in an automobile accident. The contemporaneous police report indicated that FC's vehicle was drivable following the accident. The police report further indicated that FC was not injured as a result of the accident. In keeping with the fact that FC was not seriously injured as a result of the accident, FC was not transported to any hospital emergency department following the accident. To the extent that FC experienced any health problems at all as a result of the accident, they were of minimal severity, even at their onset, and improved over time. Even so, following a purported follow-up examination of FC on July 18, 2024 – over three months after the accident – Alfonso and Alfonso, P.A. billed for the follow-up examination using CPT code 99215, and thereby falsely represented that FC presented with problems of moderate to high severity.

(ix)   On April 26, 2024, an Insured named AG was involved in an automobile accident. The contemporaneous police report indicated that AG's vehicle was drivable following the accident. The police report further indicated that AG was not injured as a result of the accident. In keeping with the fact that AG was not seriously injured

as a result of the accident, AG was not transported to any hospital emergency department following the accident. To the extent that AG experienced any health problems at all as a result of the accident, they were of minimal severity, even at their onset, and improved over time. Even so, following a purported follow-up examination of AG on July 11, 2024 – over two months after the accident – Alfonso and Alfonso, P.A. billed for the follow-up examination using CPT code 99215, and thereby falsely represented that AG presented with problems of moderate to high severity.

(x)     On August 21, 2024, an Insured named JA was involved in an automobile accident. The contemporaneous police report indicated that JA's vehicle was drivable following the accident. The police report further indicated that JA was not injured as a result of the accident. In keeping with the fact that JA was not seriously injured as a result of the accident, JA was not transported to any hospital emergency department following the accident. To the extent that JA experienced any health problems at all as a result of the accident, they were of minimal severity, even at their onset, and improved over time. Even so, following a purported follow-up examination of JA on November 25, 2024 – over three months after the accident – Alfonso and Alfonso, P.A. billed for the follow-up examination using CPT code 99215, and thereby falsely represented that JA presented with problems of moderate to high severity.

162.    These are only representative examples. In the claims for follow-up examinations identified in Exhibit "1", Alfonso, P.A. and Alfonso routinely falsely represented that Insureds presented with problems of moderate to high severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their automobile accidents at the time of the follow-up examinations – which often were months after the accidents – or else their presenting problems were minimal.

163.    In the claims for follow-up examinations identified in Exhibit "1", Alfonso, P.A. and Alfonso routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for their charges for the putative examinations under CPT codes 99214 or 99215, because examinations billable under CPT codes 99214 or 99215 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

47

**b.**     **Misrepresentations Regarding the Results of the Follow-Up Examinations**

164.     Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination represents – among other things – that the examining practitioner performed at least two of the following three components during the examination: (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

165.     Pursuant to the CPT Assistant, the use of CPT code 99215 to bill for a follow-up examination represents – among other things – that the examining physician or chiropractor performed at least two of the three following components during the examination: (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "high complexity".

166.     Though Alfonso, P.A. and Alfonso routinely billed for the purported follow-up examinations using CPT codes 99214 and 99215, Alfonso never took any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision-making at all.

167.     Rather, in the claims identified in Exhibit "1", following the purported follow-up examinations, Alfonso, P.A. and Alfonso simply: (i) caused the Insureds to receive substantially the same false, boilerplate "diagnoses" as they had received during their purported initial examination; and either (ii) caused the Insureds to be referred for even more medically unnecessary physical therapy services, despite the fact that the Insureds purportedly already had received extensive physical therapy services that supposedly had not been successful in resolving their purported pain symptoms; or (iii) discharged the Insureds from "treatment", to the extent that their PIP Benefits had been exhausted.

48

168. The putative "follow-up" examinations that Alfonso, P.A. and Alfonso purported to provide the Insureds in the claims identified in Exhibit "1" therefore were medically useless, and played no legitimate role in the treatment or care of the Insureds, because the putative "results" of the examinations were pre-determined to comport with the medically unnecessary treatment plan that was pre-determined for each Insured from the moment they walked into the Defendants' offices.

169. In the claims for follow-up examinations identified in Exhibit "1", Alfonso, P.A. and Alfonso fraudulently misrepresented that the examinations were lawfully provided and reimbursable, when in fact they were neither lawfully provided nor reimbursable, because:

(i) the putative examinations were illusory, with outcomes that were pre-determined to result in substantially similar, false "diagnoses" and treatment recommendations, regardless of the Insureds' true individual circumstances and presentation;

(ii) the charges for the putative examinations misrepresented the nature and extent of the examinations; and

(iii) Alfonso, P.A. and Alfonso were never eligible to collect PIP Benefits in connection with the examinations in the first instance, inasmuch as they operated in violation of Florida law.

**3. The Fraudulent and Unlawful "Emergency Medical Condition" Diagnoses at Alfonso, P.A.**

170. Moreover, to increase the amount of PIP Benefits that they could obtain from GEICO and other insurers, Defendants paid Lopez – a licensed physician who could provide emergency medical condition diagnoses – to falsely "diagnose" Insureds with purported "emergency medical conditions". This, despite the fact that the Insureds were not legitimately suffering from any emergency medical conditions as the result of their minor accidents.

171. Defendants routinely caused these false "diagnoses" to be included in reports purportedly signed by Lopez on Alfonso, P.A. letterhead in order to create a false justification for

the other Fraudulent Services that Defendants purported to provide to the Insureds, and to increase the Insureds' PIP reimbursement limits for health care services from $2,500.00 to $10,000.00, thereby enabling Defendants to submit the maximum amount of fraudulent and unlawful PIP charges per Insured.

172. However, to the extent that the Insureds in the claims identified in Exhibit "1" ever had any genuine medical problems at all as the result of their minor automobile accidents, the problems virtually always were limited to minimally-severe soft tissue injuries, which did not legitimately constitute any kind of "emergency medical conditions".

173. For example:

(i) On January 5, 2020, an Insured named LT was involved in an automobile accident. The contemporaneous police report indicated that LT was not injured as a result of the accident. The police report further indicated that LT was not transported to any hospital emergency department following the accident. To the extent that LT experienced any health problems at all as a result of the accident, they were of minimal severity at the outset, improved over time, and did not legitimately constitute any kind of "emergency medical condition". Even so, on January 24, 2020, Lopez – in exchange for compensation from Defendants, and at the direction of Defendants – falsely reported that LT's injuries constituted an "emergency medical condition".

(ii) On October 10. 2020, an Insured named NM was involved in an automobile accident. The contemporaneous police report indicated that NM's vehicle was drivable following the accident. The police report further indicated that NM was not injured as a result of the accident. In keeping with the fact that NM was not seriously injured as a result of the accident, NM was not transported to any hospital emergency department following the accident. To the extent that NM experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on November 6, 2020, Lopez – in exchange for compensation from Defendants, and at the direction of Defendants – falsely reported that NM's injuries constituted an "emergency medical condition".

(iii) On March 18, 2021, an Insured named DB was involved in an automobile accident. The contemporaneous police report indicated that DB's vehicle was drivable following the accident. The police report further indicated that EF was not injured as a result of the accident. In keeping with the fact that DB was not seriously injured as a result of the accident, DB was not transported to any hospital emergency department following the accident. To the extent that DB experienced any health

50

problems at all as a result of the accident, they were of minimal severity. Even so, on April 5, 2021, Lopez – in exchange for compensation from Defendants, and at the direction of Defendants – falsely reported that DB's injuries constituted an "emergency medical condition".

(iv)     On May 22, 2021, an Insured named NM was involved in an automobile accident. The contemporaneous police report indicated that NM's vehicle was drivable following the accident. The police report further indicated that NM was not injured as a result of the accident. In keeping with the fact that NM was not seriously injured as a result of the accident, NM was not transported to any hospital emergency department following the accident. To the extent that NM experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on June 4, 2021, Lopez – in exchange for compensation from Defendants, and at the direction of Defendants – falsely reported that NM's injuries constituted an "emergency medical condition".

(v)      On February 25, 2022, an Insured named LR was involved in an automobile accident. The contemporaneous police report indicated that LR's vehicle was drivable following the accident. The police report further indicated that LR was not injured as a result of the accident. In keeping with the fact that LR was not seriously injured as a result of the accident, LR was not transported to any hospital emergency department following the accident. To the extent that LR experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on March 7, 2022, Lopez – in exchange for compensation from Defendants, and at the direction of Defendants – falsely reported that LR's injuries constituted an "emergency medical condition".

(vi)     On March 19, 2022, an Insured named MP was involved in an automobile accident. The contemporaneous police report indicated that MP's vehicle was drivable following the accident. The police report further indicated that MP was not injured as a result of the accident. In keeping with the fact that MP was not seriously injured as a result of the accident, MP was not transported to any hospital emergency department following the accident. To the extent that MP experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on April 5, 2022, Lopez – in exchange for compensation from Defendants, and at the direction of Defendants – falsely reported that MP's injuries constituted an "emergency medical condition".

(vii)    On April 1, 2022, an Insured named EF was involved in an automobile accident. The contemporaneous police report indicated that EF's vehicle was drivable following the accident. The police report further indicated that EF was not injured as a result of the accident. In keeping with the fact that EF was not seriously injured as a result of the accident, EF was not transported to any hospital emergency department following the accident. To the extent that EF experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on April 21, 2022, Lopez – in exchange for compensation from Defendants, and at

the direction of Defendants – falsely reported that EF's injuries constituted an "emergency medical condition".

(viii)    On March 30, 2023, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured as a result of the accident. In keeping with the fact that MC was not seriously injured as a result of the accident, MC was not transported to any hospital emergency department following the accident. To the extent that MC experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on April 25, 2023, Lopez – in exchange for compensation from Defendants, and at the direction of Defendants – falsely reported that MC's injuries constituted an "emergency medical condition".

(ix)    On January 15, 2024, an Insured named GN was involved in an automobile accident. The contemporaneous police report indicated that GN's vehicle was drivable following the accident. The contemporaneous police report indicated that GN was not injured as a result of the accident. In keeping with the fact that GN was not seriously injured as a result of the accident, GN was not transported to any hospital emergency department following the accident. To the extent that GN experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on February 8, 2024, Lopez – in exchange for compensation from Defendants, and at the direction of Defendants – falsely reported that GN's injuries constituted an "emergency medical condition".

(x)    On April 26, 2024, an Insured named AG was involved in an automobile accident. The contemporaneous police report indicated that AG's vehicle was drivable following the accident. The police report further indicated that AG was not injured as a result of the accident. In keeping with the fact that AG was not seriously injured as a result of the accident, AG was not transported to any hospital emergency department following the accident. To the extent that AG experienced any health problems at all as a result of the accident, they were of minimal severity. Even so, on June 4, 2024, Lopez – in exchange for compensation from Defendants, and at the direction of Defendants – falsely reported that AG's injuries constituted an "emergency medical condition".

174.    These are only representative examples. In the claims identified in Exhibit "1", Defendants routinely paid and directed Lopez to falsely diagnose patients with "emergency medical conditions" so as to increase the amount of fraudulent and unlawful PIP billing that Defendants could submit to GEICO and other insurers.

**4.      The Fraudulent and Unlawful Charges for "Physical Therapy" Services at Alfonso, P.A.**

175.    In addition to their other Fraudulent Services, Defendants virtually always purported to subject each of the Insureds in the claims identified in Exhibit "1" to extensive, medically unnecessary "physical therapy" services.

176.    As set forth in Exhibit "1", Defendants then billed the purported physical therapy services to GEICO under:

(i)      CPT code 97010 for putative hot/cold pack application, typically resulting in charges ranging from $15.00 to $150.00 for each round of hot/cold pack therapy they purported to provide;

(ii)     CPT code 97012, for putative mechanical traction therapy, typically resulting in charges ranging from $75.00 to $150.00 for each round of mechanical traction therapy they purported to provide;

(iii)    CPT code 97035 for putative ultrasound, typically resulting in charges ranging from $15.00 to $150.00 for each round of ultrasound they purported to provide;

(iv)     CPT code 97110, for putative therapeutic exercises, typically resulting in charges ranging from $170.00 and $350.00 for each round of therapeutic exercises they purported to provide;

(v)      CPT code 97012, for putative mechanical traction therapy, typically resulting in charges ranging from $75.00 and $150.00 for each round of mechanical traction therapy they purported to provide;

(vi)     CPT code 97140, for putative manual therapy, typically resulting in charges ranging from $70.00 to $300.00 for each round of manual therapy they purported to provide; and

(vii)    CPT code G0283 for electronic stimulation, typically resulting in charges ranging from $30.00 and $150.00 for each round of mechanical traction therapy they purported to provide.

177.    In the claims for purported "physical therapy" services identified in Exhibit "1", Defendants never were eligible to collect PIP Benefits, because of their fraudulent and unlawful activities.

178.    Furthermore, the purported physical therapy services that were billed through Alfonso, P.A. were unlawfully performed by massage therapists and unlicensed/unsupervised individuals, and unlawfully billed to GEICO.

179.    What is more, the physical therapy services that were billed through Alfonso, P.A. to GEICO were not medically necessary, as the Defendants did not tailor the physical therapy services they purported to provide to each Insured's individual circumstances and presentation.

180.    There are a large number of individual types of physical therapy services that potentially can be provided to a patient, depending on the patient's individual symptomatology and needs. In a legitimate clinical setting, the types of physical therapy services that are provided, and the schedule for the physical therapy services, should vary significantly from patient-to-patient.

181.    However, Alfonso, P.A. and Alfonso routinely purported to provide substantially the same handful of physical therapy "treatments" to virtually every Insured in the claims identified in Exhibit "1", on substantially the same schedule, without regard for the Insureds' individual circumstances.

**5.      The Fraudulent and Unlawful Charges for "Extracorporeal Shockwave Therapy" at Alfonso, P.A.**

182.    Based upon the false, boilerplate "diagnoses" that the Insureds received during the purported initial and follow-up examinations at Alfonso, P.A. and Alfonso also purported to subject many of the Insureds in the claims identified in Exhibit "1" to one or more sessions of ESWT during the course of their fraudulent treatment protocol.

54

183. Typically, Alfonso purported to perform the ESWT at Alfonso, P.A., which then were billed through Alfonso, P.A. to GEICO under CPT code 0101T, virtually always resulting in a charge of between $675.00 and $860.00 for each round of ESWT that supposedly was provided.

184. Like the charges for the other Fraudulent Services, the charges for ESWT were fraudulent in that the ESWT was medically unnecessary.

185. In keeping with the fact that Defendants' ESWT "treatments" were medically unnecessary: (i) ESWT has not been approved by the U.S. Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain; (ii) Palmetto, a contractor for the Centers for Medicare and Medicaid Services ("CMS"), has published coverage guidance stating that ESWT is neither reasonable nor necessary for the treatment of musculoskeletal conditions; and (iii) there are no legitimate peer-reviewed data that establish the effectiveness of ESWT for the treatment of back, neck, or shoulder pain.

186. Even so, Alfonso, P.A. and Alfonso purported to provide medically unnecessary ESWT to hundreds of Insureds pursuant to their pre-determined fraudulent treatment protocol without regard to each Insured's individual complaints, symptoms, or presentation.

187. For example:

(i) On or about January 2, 2024, Alfonso, P.A. and Alonso billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named CG.

(ii) On or about January 12, 2024, Alfonso, P.A. and Alonso billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named SN.

(iii) On or about January 22, 2024, Alfonso, P.A. and Alonso billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named JP.

(iv) On or about February 2, 2024, Alfonso, P.A. and Alonso billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named ST.

(v) On or about March 8, 2024, Alfonso, P.A. and Alonso billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named MG.

(vi)    On or about May 8, 2024, Alfonso, P.A. and Alonso billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named MP.

(vii)    On or about May 20, 2024, Alfonso, P.A. and Alonso billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named FC.

(viii)    On or about June 4, 2024, Alfonso, P.A. and Alonso billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named MG.

(ix)    On or about July 11, 2024, Alfonso, P.A. and Alonso billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named DM.

(x)    On or about July 31, 2024, Alfonso, P.A. and Alonso billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named NK.

(xi)    On or about August 7, 2024, Alfonso, P.A. and Alonso billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named EG.

(xii)    On or about September 14, 2024, Alfonso, P.A. and Alonso billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named JA.

(xiii)    On or about October 22, 2024, Alfonso, P.A. and Alonso billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named DR.

(xiv)    On or about February 26, 2025, Alfonso, P.A. and Alonso billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named FR.

(xv)    On or about March 31, 2025, Alfonso, P.A. and Alonso billed GEICO for medically unnecessary ESWT they purported to provide to an Insured named EM.

188.    These are only representative examples. In the claims for ESWT identified in Exhibit "1", Alfonso, P.A. and Alfonso routinely billed GEICO for medically unnecessary ESWT they purported to provide to Insureds.

### III.    The Fraudulent and Unlawful Claims Defendants Submitted to GEICO

189.    To support their fraudulent charges, Defendants systematically submitted thousands of bills and treatment reports through Alfonso, P.A. to GEICO, containing thousands of individual charges, seeking payment for the Fraudulent Services for which Defendants were not entitled to receive payment.

190. The claims that Defendants submitted or caused to be submitted to GEICO were false, misleading, and unlawful in the following, material respects:

(i) The HCFA-1500 forms and treatment reports submitted by Defendants misrepresented to GEICO that Defendants were in compliance with Florida law and eligible to collect PIP Benefits in the first instance. In fact, Defendants never were in compliance with Florida law, and never were eligible to collect PIP Benefits.

(ii) The HCFA-1500 forms and treatment reports submitted by Defendants misrepresented to GEICO that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement. In fact, the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement.

(iii) The HCFA-1500 forms and treatment reports submitted by Defendants misrepresented to GEICO that the Fraudulent Services were medically necessary, and in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv) The HCFA-1500 forms and treatment reports submitted by and on behalf of Defendants misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided, in order to increase the amount of reimbursement Defendants could unlawfully obtain.

## IV. Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

191. Defendants were legally and ethically obligated to act honestly and with integrity in connection with their performance of the Fraudulent Services and their submission of charges to GEICO.

192. To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants have systematically concealed their fraud.

193. Defendants knowingly misrepresented and concealed facts related to Alfonso, P.A. and the Fraudulent Services in an effort to prevent discovery that Alfonso, P.A. was operated in

57

violation of the Clinic Act, the False and Fraudulent Insurance Claims Statute, the No-Fault Law, and the Physical Therapy Act.

194.   Furthermore, Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were unlawfully performed by massage therapists and unlicensed/unsupervised individuals.

195.   Moreover, Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and frequently never were legitimately performed in the first instance.

196.   For instance, Defendants submitted facially valid HCFA-1500 forms, which purported to be signed and verified by properly licensed health care practitioners, in support of their fraudulent charges, and GEICO had a right to rely on this facially-valid billing.

197.   Defendants have hired law firms to pursue collection of the fraudulent charges for the Fraudulent Services from GEICO and other insurers if the charges were not promptly paid in full.

198.   GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and acts of concealment described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $2,900,000.00.

199.   Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Again Alfonso, P.A.**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

200.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 199 above.

201.    There is an actual case in controversy between GEICO and Alfonso, P.A. regarding more than $75,000.00 in pending fraudulent claims for the Fraudulent Services that have been submitted to GEICO.

202.    Alfonso, P.A. has no right to receive payment for any pending bills submitted to GEICO because it unlawfully was operated in violation of the Clinic Act, the False and Fraudulent Insurance Claims Statute, the No-Fault Law, and the Physical Therapy Act.

203.    Alfonso, P.A. has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not lawfully provided and billed to GEICO.

204.    Alfonso, P.A. has no right to receive payment for any pending bills submitted to GEICO because the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

205.    Alfonso, P.A. has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

206.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Alfonso, P.A. has no right to receive payment for any pending bills submitted to GEICO.

## SECOND CAUSE OF ACTION
**Against Alfonso**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

207.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 199, above.

208.    Alfonso, P.A. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

209.    Alfonso knowingly has conducted and/or participated, directly or indirectly, in the conduct of Alfonso, P.A.'s affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that Alfonso, P.A. was not eligible to receive under the No-Fault Law because: (i) Alfonso, P.A. was unlawfully operated in violation of Florida law; (ii) the underlying Fraudulent Services were not lawfully provided or billed to GEICO; (iii) the underlying Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to the Fraudulent Services; (iv) in many cases, the Fraudulent Services were never provided in the first instance; and (v) the billing codes used for the underlying Fraudulent Services misrepresented and exaggerated the levels of services that purportedly were provided, in order to inflate the charges submitted to GEICO.

60

210. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart attached hereto as Exhibit "1".

211. Alfonso, P.A.'s business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Alfonso operated Alfonso, P.A., inasmuch as Alfonso, P.A. was not engaged in legitimate health care practice, and acts of mail fraud therefore were essential in order for Alfonso, P.A. to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Alfonso, P.A. to the present day.

212. Alfonso, P.A. is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Alfonso, P.A. in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

213. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,900,000.00 pursuant to the fraudulent bills submitted through Alfonso, P.A.

214. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against Alfonso, P.A. and Alfonso**
**(Under Fla. Stat. 501.201 et. seq.)**

215. GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1 through 199, above.

216. Alfonso, P.A. and Alfonso are actively engaged in trade and commerce in the State of Florida.

217. GEICO and its Insureds are "consumers" as defined by Fla. Stat. 501.203.

218. Alfonso, P.A. and Alfonso engaged in unfair, deceptive, and unconscionable acts or trade practices in their trade or commerce in the pursuit and execution of their scheme to illegally-obtain PIP Benefits from GEICO.

219. The bills and supporting documents submitted by Alfonso, P.A. and Alfonso to GEICO in connection with the Fraudulent Services were fraudulent in that they misrepresented: (i) Alfonso, P.A.'s eligibility to collect PIP Benefits in the first instance; (ii) that the Fraudulent Services were lawfully provided and billed to GEICO; (iii) that the Fraudulent Services were medically necessary; and (iv) that the Fraudulent Services actually were performed in the first instance.

220. Such acts and practices offend public policy and are immoral, unethical, oppressive, and unscrupulous. Additionally, the conduct of Alfonso, P.A. and Alfonso has been materially injurious to GEICO and its Insureds.

221. The conduct of Alfonso, P.A. and Alfonso was the actual and proximate cause of the damages sustained by GEICO.

222. Alfonso, P.A. and Alfonso's unfair and deceptive acts have caused GEICO to sustain damages of at least $2,900,000.00.

223.    By reason of Alfonso, P.A. and Alfonso's conduct, GEICO is also entitled to recover costs, and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2).

## FOURTH CAUSE OF ACTION
### Against Alfonso, P.A. and Alfonso
### (Common Law Fraud)

224.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 199, above.

225.    Alfonso, P.A. and Alfonso intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through Alfonso, P.A. for the Fraudulent Services.

226.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Alfonso, P.A. and Alfonso were in compliance with Florida law, and eligible to collect PIP Benefits in the first instance, when in fact Alfonso, P.A. and Alfonso never were in compliance with Florida Law, and never were eligible to collect PIP Benefits; (ii) in every claim, the representation that the Fraudulent Services were lawfully provided and eligible for PIP reimbursement, when in fact the Fraudulent Services were not lawfully provided, and were not eligible for PIP reimbursement; (iii) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not medically necessary; and (iv) in many claims, the representation that the Fraudulent Services actually were performed, when in many cases they were not actually performed.

227.    Alfonso, P.A. and Alfonso intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Alfonso, P.A. that were not reimbursable.

228.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,900,000.00 pursuant to the fraudulent bills that were submitted or caused to be submitted by Alfonso, P.A. and Alfonso through Alfonso, P.A.

229.     Alfonso, P.A. and Alfonso's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

230.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against Alfonso, P.A. and Alfonso
### (Unjust Enrichment)

231.     GEICO incorporates, as fully set forth herein, each and every allegation in paragraphs 1 through 199, above.

232.     As set forth above, Alfonso, P.A. and Alfonso have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

233.     When GEICO paid the bills and charges submitted or caused to be submitted by Alfonso, P.A. and Alfonso through Alfonso, P.A., it reasonably believed that it was legally obligated to make such payments based on Alfonso, P.A. and Alfonso's improper, unlawful, and/or unjust acts.

234.     Alfonso, P.A. and Alfonso have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Alfonso, P.A. and Alfonso voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

64

235.     Alfonso, P.A. and Alfonso's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

236.     By reason of the above, Alfonso, P.A. and Alfonso have been unjustly enriched in an amount to be determined at trial, but in no event less than $2,900,000.00.

## JURY DEMAND

237.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against Alfonso, P.A., a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Alfonso, P.A. has no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of Action against Alfonso, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $2,900,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against Alfonso, P.A. and Alfonso, compensatory damages in an amount to be determined at trial but in excess of $2,900,000.00, together with costs and reasonable attorneys' fees pursuant to Fla. Stat. 501.211(2);

D.     On the Fourth Cause of Action against Alfonso, P.A. and Alfonso, compensatory damages in an amount to be determined at trial but in excess of $2,900,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

E.      On the Fifth Cause of Action against Alfonso, P.A. and Alfonso, more than $2,900,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: Jacksonville, Florida
          October 9, 2025

/s/ Max Gershenoff

Max Gershenoff (FBN 1038855)
John P. Marino (FBN 814539)
Lindsey R. Trowell (FBN 678783)
Kristen Wenger (FBN 92136)
RIVKIN RADLER LLP
1301 Riverplace Blvd., 10th Floor
Jacksonville, Florida 32207
Phone: (904) 792-8925
-and-
926 RXR Plaza
Uniondale, New York 11550
Phone: (516) 357-3000
Max.Gershenoff@rivkin.com
John.Marino@rivkin.com
Lindsey.Trowell@rivkin.com
Kristen.Wenger@rivkin.com
*Counsel for Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO Insurance Company, and GEICO Casualty Co.*